14-3002 Yoder and Frey Auctioneers v. EquipmentFacts LLC Oral argument not to exceed 15 minutes per side  Good morning. May it please the court, Joseph Martin on behalf of the appellant defendant below EquipmentFacts, F-A-C-T-S, LLC. I would like to reserve two minutes for rebuttal if I may. Very well. My client made four principal arguments in its briefing. They pertain first to the spoliation issue that we spent a lot of time on. Second pertains to the trial court's admission of the Internet Service Provider's testimony and documents over my objections and motion. And third to the Computer Fraud and Abuse Act interruption of service issue. And lastly, this issue of Rule 37 sanctions. I intend to focus my argument this morning first on the spoliation issue and go from there. To that point, I will spend the next several minutes trying to convince the court that a computer system in a computer fraud case is evidence relevant to the party's claims and defenses. This case is indeed about a computer system, a system that my client is alleged to have hacked. It was an online bidding system. It was developed and operated by a company known as Real-Time Bid, which I'll refer to as RTV. My client was put in the position of litigating a case for the last three years and sitting before a jury in Toledo and having that jury pass judgment without my client ever being able to see, touch, feel, or inspect the computer system that it was alleged to have hacked. Worse, plaintiffs were permitted to talk all about that system to the jury. How it worked, the information it purportedly recorded, and that within that computer system, within that box, was evidence that my client was the source of the hacking. And this was all after the computer system had been thrown out, which happened during the lawsuit because plaintiffs never did so much as issue a litigation hold notice or even tell my client that the system was available for inspection. All my client could do at trial was sit and listen, and then when it was my client's turn to speak, all it could say was, I didn't do it. If I had that computer system, I'd show you that I didn't do it. Counsel, just by way of background, your client was very familiar with that system, is that correct? No, he was not. My client had developed a system on its own and used to provide that service, that system, to the plaintiffs. Plaintiffs then would often develop their own. My client had no knowledge of their system. Are you saying your client never had any interaction or knowledge of that system? That's correct. The RTB system is separate and apart from my client's system, the Equipment Facts system, which plaintiffs used, and then at a certain point in time, plaintiffs developed their own system that my client had no part of. Well, how does your client's system differ from that system? I'd like to tell you, but I've never seen it. My client has never seen it. We don't know, other than what we could view on the screen. Well, you know what the testimony was about the system. For the purposes of my question, the system was described in detail in some of the testimony, not that you have to agree with the testimony. Oh, sure. And that hits the nail right on the head. The system was described in detail, the system I was not allowed to see. So my client knew about the system after the fact and how it worked from the testimony sitting at trial, not because they had interaction with it other than viewing it on a screen. They weren't under the hood, so to speak, of that system. They had no part in developing it. It was developed by a gentleman up in Connecticut by the name of Richard Maverganis with input from the folks at Realtime. Well, wasn't a big issue in the trial, the whole issue, whether your client indeed did have interaction with that system? Yes, but not at the development stage. Later, when they logged on and watched the bidding happen, yes. But they didn't have familiarity with the system prior to that. I'm confused. Why is the system operation important? I mean, it wasn't the allegation, as I understand it, was that you logged on as somebody else and placed bids when you had no authorization to do so. It's not so much that you hijacked or hacked the inner workings of the computer. I mean, what? Your Honor, ask the question, why is the system important? Here's why it's important. One of my client's primary defenses was that the computer system was so error-ridden that it did not accurately record those interactions with my client or anyone else. And, in fact, during the trial, plaintiffs' own witnesses testified that those logs at Exhibit 17, which became the end-all, be-all of this trial, generated by the computer system, actually didn't accurately capture what happened at the auction. How can your client make that argument? Because, on the other hand, you're arguing that your client needed to see the system and touch the system to find out what was wrong. I mean, the argument seemed contradictory. And here's why they're not, Your Honor.  The beauty of computers, as evidenced in cases like this, is that computers don't lie. They don't shade the truth. They don't ask us to draw inferences. They have no skin in the game. It's just metal, plastic, circuits. And what happens on the circuits, warts and all, is revealed there. You just have to look at it.  that plaintiffs are using as the basis to say that my client hacked this system. So when you open up the hood and look into a computer system, you can determine, did it accurately log the information? There was evidence presented at trial that it did not. That came from plaintiffs, and it came from the gentleman who created the system, who actually wrote the code. He said, yeah, it was full of bugs. My expert, a former detective who ran the Philadelphia Cybercrime Unit, got up and said, look, there are so many errors here, it calls into question whether the Exhibit 17 and the data that was recorded and produced that was the sole basis for plaintiffs' claims was accurate. But that goes to wait. I believe that the jury heard that, and the jury could decide whether it was enough or not. Are you arguing that they deliberately got rid of it? I don't know why they got rid of it. I can't tell you that. They're not going to get up on the stand, and I'm not going to have that moment. But in order for you to get a dismissal, wouldn't you have had to show more than that the person who controlled it would get rid of it? No, I would not, actually. The Silvestri case is instructive on that. Beaven is instructive. Leon is instructive. A number of them are instructive. But Silvestri is particularly instructive because there, what the court found was that the car that was at issue in that case that was alleged to have been defective and caused an accident were available. So it wasn't in the possession of the person who crashed. It belonged to that person's landlady. That car was then sold off and ended up somewhere in Canada. But the court there said the plaintiff was at least negligent in not making that car available to the defendant to determine whether the allegations being made about that car were accurate. Ours is no different. There Silvestri said, look, the prejudice was so great that you don't have to employ that continuum that this court talks about in terms of bad faith and fault because you can't undo, I refer to it as irreparable prejudice, because you can't undo with a curative instruction, with an adverse inference charge, the fact that there is one piece of evidence in the case, the plaintiff talked about it and used it, and I never got to see it. Go ahead, I'm sorry. You know, what I'm having trouble with is you're arguing that the evidence and testimony on the one hand vindicates your client's position, and then on the other hand you're arguing that you couldn't defend yourself or you couldn't defend your client because your client didn't have access to the computer, and it just seems completely contradictory. And, Your Honor, here's why it's not. The computer records everything, good and bad. It sometimes has errors. The fact that there were errors renders the operation of the computer system relevant. Did it have errors when my client allegedly logged in? Did it have errors when other bidders logged in? We don't know that. I was denied the opportunity to see that, to test it. So you're saying that additional cumulative evidence supporting your client's position would have been there, but even without that you're still entitled to prevail? I'm not, Your Honor. I'm not saying the evidence is cumulative. What I'm saying is that the plaintiffs chose what evidence they thought was relevant and that they wanted to use at trial and discarded everything else. That everything else is really important to me. It's my defense in the case. Like what? Was there any evidence that the computer gave the wrong winning bidder? In other lots. I mean, was there some indication that this system will tell you that bidder A had the highest bid when really bidder A didn't make that bid or bidder C really made the bid? Even better, the log that was produced, the Exhibit 17, trial Exhibit 17, had bids out of order. And timing is everything here because, remember, they served the subpoena on the Internet Service Providers for particular windows of time when false bids were alleged to have been placed. So at trial there was testimony I showed on cross-examination and with my expert that things didn't happen out of order as it showed in Exhibit 17. So, yes, there were errors in the logging, in the bidding, in the timing. So it's not cumulative. Rather, it is additional evidence. In other words, that led me to have to see the computer system because it became relevant. Remember, leading up to this, the trial court said, Mr. Martin, that computer system is not relevant to your case. Well, okay, well then I'm going to try this case on the basis of convincing the court that the system was relevant. I did that. Frankly, plaintiffs did it for me. They got up and testified about it.  Let me ask you this just for clarification. There wasn't evidence, or was there, that whether you would agree with it or not that conclusively showed that your client placed one of the bids that was never followed up? No. Okay, let's stop it right there. So, and you, I think, your client doesn't deny that they had access to the system, that they were following the bidding process. We do not deny that, correct. Okay, so then at that point, the plaintiff has to, in effect, by circumstantial evidence prove their case to the jury, don't they? They do not. They can prove it by direct evidence of what's in that box, what is in that computer. But I thought you answered my question that they didn't have evidence that conclusively tied you to one of the bids that wasn't followed up on. That's not what they did at trial. They didn't come in with the box. That's what we wanted them to do. I was entitled to see that box. Instead, what they said was, we have something that we swear. May I finish my answer? Sure. We have information that we swear is an accurate representation of what happened in that box. And that led them to ask the jury to draw the inference that it must have been my client who did it. My client said, I didn't do it. Joe, go look in that box. It will show you I didn't do it. I couldn't get the box. Thank you. Thank you. May it please the Court, my name is Dave Stuckey. I represent the FLEs in this case. Regarding the spoliation issues in this case, the trial court did not abuse its discretion and did properly hold that Equipment Facts was not entitled to any sanctions for its claim of spoliation of the evidence. Having taken steps to preserve the data needed by all parties to evaluate the source of the false bids and other unauthorized access, which impaired the integrity and availability of the online auction bidding system, Yoder and Frey and Realtime Bid submit that there was no spoliation of any relevant evidence. The preservation included the preservation of over 35 million lines of information from the server that was owned and controlled by a third party, not by Yoder and Frey or Realtime Bid. That information was in the IIS log, which showed all activity on the server during the time period in question that included the IP addresses that eventually associated Equipment Facts to the improper conduct that was being seen. All of that information was provided to the defendant in the case in the exact way it was transmitted to Yoder and Frey and Realtime Bid by that third party that controlled the server. Realtime Bid and Yoder and Frey needed the IP addresses associated with the winning online bids because Allied Erecting, which was identified as the bidder because they had used their information about Allied Erecting that they knew about, claimed that it had not made the winning bids on some 18 different occasions. So Yoder and Frey and Realtime Bid had to figure out what was going on. Was Allied Erecting telling the truth or not? So they needed the IP addresses to try to prove that Allied Erecting owed them the money, had made these bids. Instead, they found out these IP addresses did not relate to Allied Erecting, but in fact all of them went back to Equipment Facts. Okay, so if the black box, okay, had glitches that were messing up the timing of bids, is it possible that these bids were made but they were not the winning bids, that they were higher bids that came after? No, and there's no evidence that supports that, and there was no evidence that there was any problems with any other winning bids in that entire auction for anybody other than the things that went back to Equipment Facts. Mr. Clark testified about that in the record at 2439, that the only problems with the online bidding platform regarding false bids went back to Equipment Facts. There was nothing to indicate that the server that was owned by Mr. Mavrogiannis was having any problems at all. There's nothing to support that. This is like arguing that you preserved the photographs, and the camera's gone, but there's no evidence the camera had ever taken any other bad photos or any false photos. But that's what they're claiming, and the evidence is overwhelming, that it only goes back to them showing this isn't a server problem. This is not like the Silvestri case, which was a product liability case in which the automobile itself was at issue in the case. There's nothing, and this isn't a claim about a product liability of the server, and again, as I just noted, there's nothing to indicate that that server was not giving proper information. One of the elements under the Bevins case is that the server had to be relevant to the defense such that a reasonable trier of fact could conclude that it would support the defense. Here we have a situation where there's nothing to indicate that it's reasonable to think that having that server would support the defense that they're trying to make. Talking about the Bevins case, the Yoder and Fry had to be shown by the defendant in the case to have control over the server with an obligation to preserve it at the time it was discarded. First of all, Yoder and Fry in real-time bid did not control this. It was controlled by Mr. Mavrogainis, who testified it was under lock and key, that Mr. Clark had no access to the software, the operating system, that he, Mavrogainis, had control over it. At the time it was discarded, all the information on it had been preserved. So at the time it was discarded, even Mr. Mavrogainis wouldn't have thought there was any obligation to preserve what was already preserved. The information from it had already been saved, and that information was presented to Equipment Facts for their use, the same as what we had to use it. There is no evidence that Mr. Clark, at the time Mr. Mavrogainis discarded the server, had any knowledge it was even going to be discarded. He didn't know that. And the testimony was that we had verbatim what was on the IIS log. So already having the data from the server, with no reason to think that the server was giving any false information, because there's nothing else like this throughout this entire online bidding process. And we're not talking about just one day here. We're talking about several days over about three or four days of use at a very big sale. Further, they had to prove under Bevins that the server that they're claiming was spoliated was discarded with a culpable state of mind. Here, we produced everything that we had. We had no reason to think there's anything wrong with the server, and I think that's a very solid assumption. Nobody had any reason to believe that. So it was discarded. Nobody's thinking they're throwing away anything without already having saved the evidence, and that was proven. And finally, the third element, we've already talked about it. This server itself was not relevant where the information had been saved, and no reason to think that it was malfunctioning in some way, based upon the evidence in this case. Did the person who owned the server say that it had all sorts of problems? No. He said that the IIS log that he presented contained all the information accurately. It was from actually the stuff comes through as part of the Microsoft system that is on these servers that records the information that was provided. Is it correct that the information that was saved was basically the data as opposed to the operating system? Yes. Okay. Yeah. They preserved everything, any and all activity, data of any and all activity during the auction itself. I think when you look at the spoliation issue as well, one other point is that Equipment Facts is seeking the ultimate sanction in this case, dismissal, which certainly, for all the reasons already stated, is not justified. But they didn't even ask for any kind of jury instruction related to any inferences that might be taken based upon their claim of spoliation. Nonetheless, the court did instruct the jury that they were entitled to make whatever inferences they felt were appropriate based on all the evidence, and, in fact, the arguments were made by both sides concerning that. So they're just way overreaching on a case in which there's no evidence to support that they met the burden of proof as to all three elements under Bevins. Now, if the court would like, I can talk about the other issues that they've raised but haven't discussed here this morning. If you have any questions regarding the CFAA claim or the business records claim. Well, you have the floor if you want to. Okay. I would like to. Don't feel compelled to. I didn't know if you had any questions. I would like to comment just a little bit about the CFAA claim. They claim that we didn't prove any damage or loss as that's defined. Damage is defined as impairment of the integrity and the availability of the data, program, system, or information. Clearly, both the integrity of the system and the availability of the system were impaired by the misconduct of equipment facts. It was not available for real bidders to bid the amounts that they bid, and in some cases a bidder could say somebody wanted to bid $20,000 on a piece of equipment. If they bid up to $20,000, that bidder that wanted to do that would have been precluded from doing that. It clearly impaired the integrity and the availability of the system. Another way that it impaired the integrity and availability of the system is, let's say that someone bid, who again wants to bid up to $20,000 on a piece of equipment, had a bid at $18,000 and they're going in increments of $1,000. They come in and place a false bid at $19,000, forcing the other bidder to come back at $20,000 when they really would have had it at $18,000. Whose claim is that? Maybe the bidder is not yours because you've got more commission. It's their claim as well. It does, though, show that they're impairing the integrity of the system. They're impairing the – it now appears like we're having a bad sale, and that's because of their conduct, and we had to investigate that and find out what was going on so we don't want that happening. We want to have fair auction sales. Then the definition of loss, it means really two things. Any reasonable cost to which the victim has, including the cost of responding to an offense and conducting a damage assessment, and any revenue loss, cost incurred, or consequential damages incurred because of interruption of service. We proved both of those. We proved that we had reasonable cost to investigate and respond to the offense, and we also had cost incurred and revenue lost because of the interruption of service. Certainly if what they did was to come in and do this conduct and win every single item and then not pay for it, nobody would be claiming that that was not an interruption of the service. The fact they only did it 18 times doesn't mean they were not interrupting the service at the time. So for those reasons and the other reasons that are stated in our briefs, we submit that the trial court got this right on all the issues and that the abilities of Yoder and Frey and real-time bid are entitled to have this judgment affirmed and this appeal dismissed. Thank you. Thank you. I think there's some confusion about what interruption of service means. Interruption of service, let me give a classic example with a denial of service attack where someone floods a website, a server, with so much traffic that it shuts it down and renders it unusable to the intended users. Here, that didn't happen. The testimony throughout the trial was that the system worked as designed. Bids came in, bids were received, bids were recorded and continued the process. The harm was not suffered at the computer system level, which is required for an interruption of service. Here is where the harm was suffered. Someone places a bid. Let's say that bid is for $100 on a piece of machinery. That person is the winning bidder. Invoice goes out to winning bidder. Winning bidder then says, I'm not paying. The harm was the not paying, and that's why the jury found on the breach of contract case that there was a contract formed between my client when they placed the bid and Mr. Stuckey's client when they accepted the bid as the winning bid, and then my client didn't pay. That does not retroactively make the bid an interruption of service. Interruption of service is measured at the time someone interacts with the computer, and in the case of denial of service attacks, shuts it down. That didn't happen here. The system worked as intended. There is a design limitation, of course, in these systems, which is they can't tell between true bids, false bids, or any other types of bids. That only becomes evident once someone doesn't pay, but that thereby does not render the prior bid an interruption of service. Thank you. Thank you. The case is submitted, and when you're ready, you can call the next case.